UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| SARAH SCHOPER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No. 4:20-cv-04232-SLD-JEH |
| | ) |
| BOARD OF TRUSTEES OF WESTERN | ) |
| ILLINOIS UNIVERSITY, | ) |
| | ) |
|     Defendant. | ) |

ORDER

Before the Court is Defendant Board of Trustees of Western Illinois University's ("WIU") motion for summary judgment, ECF No. 18. For the following reasons, the motion is GRANTED.

**BACKGROUND[1]**

Plaintiff Sarah Schoper began teaching at WIU's Macomb, Illinois, campus in 2011. A tenure-track assistant professor in the Department of Educational & Interdisciplinary Studies ("EIS"), she taught in the College Student Personnel ("CSP") program, a two-year graduate program for students interested in student affairs positions at colleges and universities. She taught the same six classes every year, three in the fall and three in the spring, in a schedule called a "three-three load." Schoper Dep. 40:18–20, ECF No. 18-2.

**I. Tenure at WIU**

Because this is a denial of tenure case, *see* Compl. 3–7, ECF No. 1, the Court must describe the tenure process at WIU generally before proceeding. At WIU, this process is

---

[1] The facts in this section are drawn from Defendant's statement of undisputed material facts, Mot. Summ. J. 3–13, ECF No. 18; Plaintiff Sarah Schoper's response to Defendant's statement and additional facts, Resp. 2–11, ECF No. 20; Defendant's reply thereto, Reply 2–9, ECF No. 24; and exhibits to the filings, which are identified using descriptive titles and corresponding ECF page number(s) using original page numbers where appropriate.

1

governed by Article 20 of the Collective Bargaining Agreement ("CBA") between WIU and the academic faculty union, and supplemented by department-specific criteria.

The timeline consists of six "probationary years." *See* CBA 41–42, ECF No. 18-1 at 9–167 (capitalization altered). Though known as PY1, PY2, and so on, these intervals do not correspond to academic or calendar years; some represent one semester while others encompass two or several. Non-tenured faculty undergo annual retention evaluations through PY5, then apply for tenure in PY6. However, the CBA permits a "one-year extension of the evaluation period for tenure [or for advancement to the next probationary year] as a consequence of exceptional circumstances," including childbirth, caregiving, or "significant" illness, so long as the request is "made within one year after commencement of the exceptional circumstance" and before "the submission date for the . . . application." *Id.* at 52, 56. This mechanism is known as "stop the clock." *See, e.g.*, Morgan Aff. ¶ 32, ECF No. 18-1 at 1–7 (quotation marks omitted); CBA xvi (using that term in the CBA index).

Tenure is awarded by the Board of Trustees "upon the positive recommendation of the University President following an extensive evaluation process." CBA 53. First, a Department Personnel Committee ("DPC") reviews the candidate's application portfolio, making a positive or negative recommendation to the department chair and dean. The chair and the dean review the portfolio and issue recommendations of their own. If there are any negative recommendations, a College Personnel Committee ("CPC") and University Personnel Committee ("UPC") also review the portfolio and issue recommendations. (Note that at various steps along the way, a candidate can ask for reconsideration.) Finally, the University President reviews all the materials with the Academic Vice President and Provost and individually determines whether to recommend the candidate to the Board of Trustees. A candidate who is

not recommended by the University President is issued a terminal contract for the subsequent academic year.

The CBA provides that all tenure candidates are to be evaluated in three categories: (1) teaching and primary duties, (2) professional activities (*i.e.*, published scholarship), and (3) service. Each department must develop its own "[m]aterials and activities appropriate . . . for each of the three areas of evaluation." *Id.* at 42. Accordingly, the EIS Department developed its own Department Criteria, ECF No. 18-1 at 169–85, in effect during Plaintiff's time at WIU. For instance, the Department Criteria for teaching and primary duties consisted of five required items: (1) English proficiency; (2) peer and chair evaluations; (3) student evaluations; (4) syllabi; and (5) primary duties assigned by the chairperson. *Id.* at 2.

In the EIS Department, students evaluate each class at the end of the semester. Part A of the evaluation solicits quantitative responses: Students receive a list of statements (*e.g.*, "The instructor was prepared for class") and signal agreement or disagreement by selecting numbers one through five. The numbers are then averaged, with higher averages being more positive. Meanwhile, Part B solicits written responses. During Plaintiff's time at WIU, the EIS Department Criteria required tenure candidates to submit Part A averages and Part B evaluation summaries for all classes taught "during [the] evaluation period," though summer courses were optional and did not need to be submitted. *Id.*

The Department Criteria also denoted certain Part A averages as "performance standards" and "minimum requirements" for advancement. *Id.* at 9. Of particular relevance here, "4.0 w[as] . . . the minimum for . . . tenure." *Id.* at 11. Nevertheless, the Department Criteria cautioned that "statistical thresholds" were intended to "clarify general expectations" and "not expected to be absolutes to be used as the sole basis for decision making." *Id.* at 10; *see also id.*

at 11 ("Failure to achieve some minimum score on student evaluations shall not be considered sufficient reason to reject a performance level without consideration of other teaching performance indicators.").

Meanwhile, the CBA offers further guidance as to consideration of student evaluations. Specifically, it provides that

> Faculty shall be evaluated on the basis of more than one measurement of teaching effectiveness. Numerical scores on student evaluations shall not be the sole determinant in retention, tenure, promotion, and five-year appraisal recommendations. Evaluators should not render negative personnel decisions based on one or a few low scores or one or a few classes, but, rather, evaluators should interpret numerical scores from student evaluations in terms of clear and consistent 'patterns' that have developed over the appropriate evaluation period.

CBA 57.

## II. Plaintiff's PY1 through PY5

Plaintiff's PY1 and PY2 were her first two semesters at WIU. Her PY3 encompassed the fall 2012 and spring 2013 semesters; her PY4 encompassed the fall 2013 and spring 2014 semesters; and her PY5 encompassed her fall 2014 and spring 2015 semesters.

Plaintiff, however, did not teach during the spring 2015 semester. On January 6, 2015, she suffered a pulmonary embolism, leaving her hospitalized for 46 days. As a result, she went on medical leave.

Plaintiff had suffered a traumatic brain injury ("TBI"), which she avers "completely changed [her] life." Schoper Decl. ¶ 17, ECF 20-1. It caused her to develop drop foot, a condition in the nerves of her legs affecting her mobility, and left neglect, a perception deficit affecting her field of vision. She also developed mild aphasia, causing difficulties with word recall and slowness of speech. But she was "determined to return to teaching." *Id.* ¶ 22. Among

other reasons, her neurologist advised "complex intellectual activities" would facilitate recovery. *Id*.

On May 28, 2015, Plaintiff received a release from her physician indicating her she could return to work with certain restrictions. Sometime thereafter, Plaintiff met with Andrea Henderson, the director of WIU's Office of Equal Opportunity and Access, who arranged for certain accommodations for her classroom (*e.g.*, suitable seating and flooring).

That summer, Plaintiff taught an online course. She returned to her typical three-class load in fall 2015, and during that semester, submitted her PY5 portfolio to the DPC for her retention evaluation.

Sometime after Plaintiff submitted her portfolio, Jim LaPrad, a member of the EIC Department DPC, asked to meet with her in his capacity as a DPC representative. According to Plaintiff, LaPrad's primary purpose was to discuss the publication requirements for tenure, and the two went "around and around" about what types of publications would satisfy the Department Criteria. Schoper Dep. 136:3–12. At one point during the conversation, LaPrad asked Plaintiff if she had thought about taking time off. LaPrad also gave Plaintiff a book about an individual who had suffered a TBI that was "not a happy book." *Id.* at 142:5.

Plaintiff mentioned LaPrad's comment about taking time off to the department chair at the time, Gloria Delany-Barmann. Delany-Barmann told Plaintiff to follow her neurologist's advice. The pair also met later that month to discuss complaints Delany-Barmann had received from students in one of Plaintiff's second-year classes. Delany-Barmann told Plaintiff the students were "just being mean and that [she] knew her stuff." Schoper Decl. ¶ 30.

Ultimately, the DPC recommended Plaintiff for advancement to PY6. It noted that Plaintiff's average peer, chair, and student evaluation scores "exceed[ed] . . . criteria," with

5

"[q]ualitative comments overall match[ing] the quantitative values." 2014–2015 Summary Evaluation Form 2, ECF No. 21-2 at 2–3. The DPC also reminded Plaintiff that to receive tenure Plaintiff would need to submit two "published refereed journal articles" in "appropriate journals." *Id.* at 3.

On January 6, 2016, Plaintiff received the student evaluations for her three fall 2015 semester courses. Though her fall 2014 Part A scores averaged around 4.6, her fall 2015 Part A scores only averaged around 3.8. Moreover, the Part B feedback contained negative comments. One student described Plaintiff as a weed that needed to be plucked from the CSP program; another implied she had the teaching skills of a child. Still other respondents suggested Plaintiff "was not the teacher [she] used to be and . . . needed more time to recover." Schoper Decl. ¶ 38.

Plaintiff "had never received such mean comments on [her] evaluations" and "interpreted these comments to mean that [her] brain injury had caused [her] to be stupid or retarded." *Id.* She also felt that some of the comments violated WIU's anti-discrimination policies. She met with interim EIS Department Chair Katrina Daytner to discuss the comments. Plaintiff told Daytner that she felt her students were reacting poorly to her disabilities and had potentially made discriminatory comments. Daytner agreed that the comments were mean, but told her that she was going to need to show that she had responded to the feedback to obtain tenure. The two discussed changes Plaintiff could make to her teaching to demonstrate her responsiveness. Plaintiff decided not to act on her concerns about the discriminatory comments, believing it would exacerbate the situation and harm the CSP program.

### III.     Plaintiff's Application for Tenure

Plaintiff's tenure evaluation process occurred as follows.

### a. DPC Review and Reconsideration

On January 31, 2017, the DPC, now chaired by LaPrad, issued its recommendation. The DPC found that Plaintiff satisfied the Department Criteria for service but not publications or teaching. With respect to teaching, the DPC noted "a consistent decline in quantitative evaluations," observing that she "failed to meet [the] minimum criteria of [a 4.0 Part A average]" in seven of her ten most recent courses, instead receiving averages between 3.14 and 3.78. DPC Evaluation Form 187, ECF No. 18-1 at 187–90. The DPC further noted that "[q]uantative item analysis" combined with qualitative comments "clearly corroborate[d] deep concerns in the area of Teaching/Primary Duties throughout her time of employment at WIU." *Id.* It found that Plaintiff "ha[d] not mentioned, addressed, or provided an explanation for the quantitative course evaluations that fell below minimum criteria in her teaching narrative." *Id.* at 188. Moreover, the DPC wrote, "an alarming number of constructive yet critical comments" expressed "common concerns across multiple semesters and years," including those such as:

- [Plaintiff] has favorites who are her followers. She won't wall them out like other people in class.
- It was obvious [Plaintiff] was doing everything she could think of to get us to like her. She would tell us she loved us often, which is a nice sentiment but made me uncomfortable.
- [Plaintiff] does not know how to take feedback and time and time again makes class feel like a waste of time. It is not unusual to leave class feeling as though nothing was accomplished.
- She is unprepared and unprofessional. Our instructor regularly brings up tenure at the end of the semester prior to evaluations and openly laments not having tenure. She will bad mouth other teachers in the program during class and it seems like her grading has nothing to do with performance but is rather linked to how much she likes you or how much you bend to her will.

*Id.* (quotation marks omitted).

Although the DPC went on to acknowledge positive comments and positive peer and chair evaluations, it concluded that it "unanimously believe[d] that [Plaintiff] fail[ed] to meet

7

requirements for tenure and promotion in the area of Teaching/Primary Duties." *Id.* As to scholarship, the DPC found that Plaintiff's publications did not meet requirements pertaining to research methodologies and the national status of the publishing journal.

In a nine-page letter dated February 8, 2017, Plaintiff asked the DPC to reconsider its decision. She first argued that "simple math" demonstrated she met the Department Criteria because her mean evaluation score across all courses was 4.26. Feb. 8, 2017 Schoper Letter 192, ECF No. 18-1 at 192–200. She also argued that the DPC's decision violated the CBA's prohibition on rendering decisions based on a few poor evaluation scores. She then addressed her TBI. She wrote that, at first, she "deliberately chose not to mention [her] injury in [her] initial narrative" and "felt no need to ask for any accommodations," but now realized that her evaluators may not understand "how [her] TBI related disabilities play out in the classroom." *Id.* at 194. After elaborating on how drop foot, left neglect, and aphasia affected her teaching, Plaintiff observed that those changes "may have caused some students frustration" but she was "sure these concerns [would lessen] with time." *Id.* at 197. Plaintiff concluded that the DPC's "pointed use of [her] post TBI recovery period necessitated" the forgoing discussion of her disability, writing that "the choice of her post injury period [wa]s curious enough that it might give a reasonable person pause." *Id.*

Along with her letter, Plaintiff submitted a letter from her neurologist, who opined that Plaintiff "was able to return to her work to a 60% to 80% capacity" and "continue[s] to work on her recovery process to be able to return to 100% capacity." Neurologist Letter, ECF No. 21-3 at 25. The neurologist recommended "without any hesitation for [Plaintiff] to be allowed to continue her professional development and to be reconsider her tenure [sic]." *Id.*

8

The DPC responded in an unsigned letter dated February 16, 2017. It wrote that its seven members "acknowledge[d] and respect[ed]" Plaintiff's experience and carefully discussed her letter, but "did not find additional information that would cause us to conclude that [she] met the requirements for tenure and promotion" and accordingly stood by its decision unanimously. Feb. 16, 2017 DPC Letter 1, ECF No. 18-1 at 202–03. Among other observations, the DPC noted "misunderstanding" and "confusion" with respect to the minimum Part A requirements and PY6 timeframe. *Id.* It also remarked that the "allusion to any other motive" in its decision would "give[] a reasonable person pause, indeed." *Id.*

### b. Chair Review and Reconsideration

The next reviewer, Department Chair Greg Montalvo, concluded that Plaintiff met the Department Criteria in scholarship and service but not in teaching. He noted that Plaintiff's "student evaluations for PY6 ranged from 3.14 to 4.57 with an overall average of 3.84," falling below the minimum requirements. Chair Evaluation Form 205, ECF No. 18-1 at 205–07. Montalvo found that "close analysis" of Plaintiff's record revealed Plaintiff had been "well on track" to meet Part A requirements prior to the fall of 2015. *Id.* However, the "dramatic change" in both quantitative and qualitative student evaluations "clearly show[ed] a shift in student satisfaction since returning from medical leave." *Id.* Montalvo concluded that "[o]ver time, [Plaintiff] may be able to make the necessary adjustments to her teaching, but the evidence show[ed] that she has not found the right combination of methods to meet the department's expectations at that time." *Id.*

In a letter dated February 20, 2017, Plaintiff requested reconsideration. Reiterating many of the arguments in her DPC reconsideration letter and including a similar discussion of her disabilities, Plaintiff wrote that if her student evaluations were "the reason for not moving [her]

forward in the process, it would behoove [him] (and the DPC) to consider any potential reasons" for the low scores. Feb. 20, 2017 Schoper Letter 2, ECF No. 18-1 at 209–216

Montalvo responded five days later in a letter to Plaintiff. He wrote that while he "appreciate[d]" her efforts to "help reviewers understand her medical condition," his responsibility was "to give an evaluation of [her] performance based on the criteria outlined," which he concluded fell short of the Department Criteria. Feb. 25, 2017 Montalvo Letter, ECF No. 18-1 at 218.

After Montalvo issued his reconsideration letter, the pair met. According to Plaintiff, Montalvo told Plaintiff his decision regarding her recommendation was the hardest he had ever had to make. Later, Plaintiff asked him what he would do if she was able to get the union to agree to give her more time to make tenure. He pulled the union contract from his shelf, flipped through it, and explained that nothing in the contract would allow him to do that. He said that "the only thing [he] c[ould] think of for [her] to do is to apply for long-term disability." Schoper Dep. 153:16–18.

    c. **CPC Review and Reconsideration**

The CPC, the next reviewer, concluded unanimously in a March 9, 2017 letter to Dean Erskine Smith that Plaintiff had met the requirements for scholarship and service, but not teaching. It found that Plaintiff's "student evaluation scores ha[d] been below the 4.0 benchmark set forth in the [Department Criteria] for 7 of her last 10 courses" and that she had not adequately addressed the negative qualitative feedback in the Part B student evaluations. Mar. 9, 2017 CPC Letter, ECF No. 18-1 at 220. Plaintiff again requested reconsideration, but the CPC did not change its ultimate decision—although one member did change positions, now voting that Plaintiff had met the teaching requirements.

10

### d. Dean Review

In a letter to Plaintiff dated March 17, 2017, Dean Smith stated that he could not recommend Plaintiff for tenure because she failed to satisfy the teaching requirements. After observing her 3.84 Part A average for PY6, he noted her Part B comments "showed positive and negative aspects of [her] teaching," with negative aspects including "the need for balance between assignments" and "concern[s] about the learning environment." Mar. 17, 2017 Smith Letter, ECF No. 18-1 at 229. Again, Plaintiff asked Dean Smith to reconsider, but he maintained his original decision.

### e. UPC Review

The UPC met on April 10, 2017 to consider Plaintiff's application. This time, the UPC recommended that she be awarded tenure as she had met her teaching, scholarship, and service requirements. Noting that "[t]he evaluation period for tenure and promotion begins with the initial hiring date at WIU," the UPC wrote that "[w]hile [Plaintiff's] student evaluations fell below 4.0 in PY6, the clear language of the [CBA] and the Department Criteria does not treat PY6 separately from the entire evaluation period, so those lower scores and problematical comments should not be given undue weight." Apr. 10, 2017 UPC Letter 1, ECF No. 18-1 at 239–40.

### f. President's Review

Finally, University President Jack Thomas issued his decision in a May 1, 2017 letter. Ultimately, he wrote that he could not support Plaintiff's application for tenure. Although he found that Plaintiff had met the requirements of scholarship and service, "[he] concur[red] with [her] DPC, Chair, CPC, and Dean that [she had] failed to demonstrate the level of performance

11

necessary to support [her] application for promotion and tenure." May 1, 2017 Thomas Letter, ECF No. 18-1 at 244. Per Thomas's letter and the CBA, Plaintiff was issued a terminal contract.

On November 11, 2020, Plaintiff filed this action against Defendant, *see* Compl. 1, alleging Defendant denied her tenure on the basis of her disability and failed to accommodate her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101–213, *see* Compl. 3–7.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate if the party opposing summary judgment fails to establish a genuine issue of fact on an element essential to its case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Where one party has properly moved for summary judgment, the non-moving party must respond "by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"—that is, whether "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence "in the light most favorable to the non-moving party[] and draw[] all reasonable inferences in that party's favor." *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). "A genuine issue for trial exists only

when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994)).

## II.    Analysis

### a.  Disability Discrimination

To prevail on her claim, a disability discrimination plaintiff "must show (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) she suffered an adverse employment action; and (4) the adverse action was caused by her disability." *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022) (citing *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020)).  For an adverse action to be caused by the plaintiff's disability under the ADA, but-for causation is required. *See id.* at 440 n.11.[2]

Defendant begins by arguing that Plaintiff cannot make out a *prima facie* case of disability discrimination.  Mot. Summ. J. 14–15.  Under "the well-known and oft-used *McDonnell Douglas* [*v. Green*, 411 U.S. 792 (1973),] framework for evaluating discrimination," *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018), the plaintiff carries the initial burden of establishing his *prima facie* case "by showing that (1) he is a member of a protected class, (2) he was meeting the employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably," *Reives v. Ill. State Police*, 29 F.4th 887, 891 (7th Cir. 2022).  If he does so, his employer must "offer a legitimate, non-discriminatory reason for

---

[2] The Seventh Circuit generally "continue[s] to assume" the ADA requires but-for causation. *See Brooks*, 39 F.4th at 440 n.11.  Because Plaintiff does not argue that the Court should adopt a different causation standard or otherwise object, *see generally* Resp. Mot. Summ. J., ECF No. 20 [since you included "ECF No. 20" in the first note, I don't believe you need it here again?], the Court will apply but-for causation here, *see Kurtzhals*, 969 F.3d at 728 (applying but-for causation where the plaintiff "ha[d] not complained" about its use).

the challenged employment action. If the employer does so, the burden shifts back to the plaintiff to prove pretext." *Carson v. Lake Cnty.*, 865 F.3d 526, 535–36 (7th Cir. 2017).

However, "*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Under the framework articulated in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016), the court simply evaluates "whether the totality of the evidence shows discrimination." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021); *see also Ortiz*, 834 F.3d at 766 ("[A]ll evidence belongs in a single pile and must be evaluated as a whole."). A plaintiff may present evidence under either, or both, approaches. *David*, 846 F.3d at 224 (noting the *McDonnell Douglas* framework "survived" *Ortiz* and evaluating the plaintiff's evidence under both frameworks); *Reives*, 29 F.4th at 892–94 (the same).

Although Defendant argues that Plaintiff cannot establish a *prima facie* case of disability discrimination, Plaintiff does not appear to respond to this argument. *See* Resp. Mot. Summ. J. 18–20. Indeed, she points the Court to no comparators who allegedly received more favorable treatment. *Cf. Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 858 (7th Cir. 2019) (noting that "[o]nly" when the plaintiff in a failure to promote case "compare[d] herself to the successful applicant[s] . . . . would the burden of production shift to the [defendant] to give non-discriminatory reasons for the promotion decisions"). Instead, she points the Court to "two types of evidence that support the inference that [Defendant] had improper discriminatory intent." Rep. Mot. Summ. J. at 18. As Plaintiff herself does not employ the *McDonnell Douglas* framework, the Court will simply consider whether this evidence is sufficient to survive summary judgment—that is, whether a reasonable fact-finder could conclude from these two types of evidence that Plaintiff's TBI was the cause of her failure to be awarded tenure.

First, Plaintiff argues that both LaPrad and Montalvo "told her that she should take time off or consider disability." *Id.* at 18. According to Plaintiff, "these statements from key decision makers in the tenure process evidence stereotypical attitudes against individuals suffering disabilities, especially brain injuries." *Id.* Defendant, meanwhile, responds that "there is no indication of a tie to discrimination" in those remarks, emphasizing that LaPrad's comment was made 16 months prior to Plaintiff's ultimate tenure decision. Reply 9, ECF No. 24.

First off, the Court notes that there is precious little context in the record for these interactions. *Cf. Blasdel*, 687 F.3d at 822 (characterizing potentially discriminatory comments as "of ambiguous import at best"). In particular, LaPrad asking Plaintiff if she planned to take time off, without more, hardly seems insidious; such information would be pertinent to him as a member of the DPC. However, if the Court were to assume LaPrad and Montalvo's remarks supported the inference that each harbored discriminatory intent, Plaintiff would still encounter another hurdle. "Even if invidious considerations play a role in [a] department's recommendation for or against tenure, they may play no role in the actual tenure decision . . . at a higher level." *Blasdel v. Northwestern Univ.*, 687 F.3d 813, 817 (7th Cir. 2012); *see also Haynes v. Indiana Univ.*, 902 F.3d 724, 734 (7th Cir. 2018) ("[O]ur inquiry centers on the motivations of the ultimate decision-makers."). Here, Plaintiff does not suggest that University President Thomas's ultimate decision to not recommend Plaintiff for tenure was influenced by LaPrad or Montalvo rather than his review of the record before him in the aggregate, stymying a cat's paw theory of discrimination. *See Taleyarkhan v. Trs. of Purdue Univ.*, 607 F. App'x 548, 551 (7th Cir. 2015) ("A plaintiff can prevail under the 'cat's paw' theory of employment discrimination if he can show that an employee with discriminatory animus caused an unwitting decision-maker to take adverse action."); *see also Grant v. Trs. of Indiana Univ.*, 870 F.3d 562,

570 (7th Cir. 2017) (plaintiff could not survive summary judgment on cat's paw theory of liability without proffering evidence of proximate cause). As "tenure decisions typically involve 'numerous layers of review' by 'independent and University-wide committees,' the causal connection between any possible discriminatory motive of a subordinate participant in the tenure process and the ultimate tenure decision is [typically] weak or nonexistent." *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007). The Court finds this is especially true here because President Thomas had the benefit of the full record, including the UPC's positive recommendation of Plaintiff.

Second, Plaintiff argues that Defendant impermissibly relied on discriminatory student evaluations. *Id.* at 18–20. She maintains that "the evidence shows that one of the causes of [her] temporary decline in student evaluation scores" was her students' adverse reactions to "changes she made to her teaching methods due to her disability." *Id.* at 18. For example, students complained her class was "too structured" and that she used an agenda to keep organized. *Id.* When students complained about her teaching, however, "officials either minimized the problem or told [her] to take measures that they thought would improve her evaluation scores." *Id.* at 18–19. Plaintiff argues that absent "action . . . to ensure that . . . students understood the nature of [her] disabilities," Defendant "was not entitled to rely on those evaluations to determine whether [she] was a superior teacher." *Id.* at 19–20.

The Court, however, finds this argument undeveloped and difficult to square with the limited information in the record about the evaluations themselves. Plaintiff argues in her response that she received poor evaluations because her teaching became too structured after changes she implemented due to her disabilities. *See id.* But without any supporting evidence in the record—such as testimony from student and faculty or the evaluations themselves—that

16

speculation is hard to countenance. More importantly, the negative Part B comments the DPC and subsequent reviewers referenced in their evaluations of Plaintiff did not pertain to the structure or organization of Plaintiff's course, but rather perceived favoritism and an uncomfortable classroom environment due to Plaintiff's references in the classroom to tenure. DPC Evaluation Form 188. Plaintiff does not make any argument that the reason for the negative comments relied upon by her evaluators was either her disability or any subsequent changes to her teaching. Nor is there evidence that administrators ever rebuked, explicitly or implicitly, those negative comments. Because Plaintiff does not attempt to show that the negative comments that concerned her evaluators implicated her disability, the Court finds that Plaintiff cannot show her disability was the but-for cause of her failure to be recommended for tenure, and summary judgment for Defendant on this claim is appropriate.

### b. Failure to Accommodate

"To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005); *see also Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1066 (7th Cir. 2008) ("In other words, if the employer can make reasonable changes to features of the job or the work environment so that a disabled person can work satisfactorily, the employer has to make those changes."). Plaintiff appears to make two main arguments under this umbrella. First, she contends that Defendant failed to accommodate her because she did not receive more time to demonstrate her qualifications for tenure. *See* Resp. Mot. Summ. J. 12. She argues that extra time "would have caused no hardship" and would have allowed Defendant "to retain an experienced and superior teacher." *Id.* at 12–13; *see also id.* at 14 ("It would have

17

been appropriate for [WIU] . . . to delay its tenure decision to consider additional evidence."). She also suggests that Defendant could have considered her spring-semester evaluations in its deliberations or allowed her to reapply for tenure the next year. *Id.* at 14 n.2, 17.

Second, Plaintiff argues that Defendant failed to engage in the interactive process—the requisite exchange through which employer and employee "determine the appropriate accommodation under the circumstances," *Igasaki*, 988 F.3d at 961(quotation marks omitted). *Id.* at 13–18. Though Plaintiff "made her requests known" to her reviewers in her reconsideration letters, Defendant "just ignore[d]" them in the form of an impermissible "flat denial." *Id.* at 17.

Defendant responds that it *did* engage in the interactive process when Plaintiff met with Andrea Henderson from the Office of Equal Opportunity and Access. Mot. Summ. J. 19–20; Reply 10–11. It also characterizes Plaintiff's proposed accommodation of more time to apply for tenure as "a second bite at the apple" that is not required under the ADA rather than an accommodation. Reply 11. The Court finds that characterization persuasive. *See Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995) ("[A second chance] is not an accommodation."); *cf. Davila v. Qwest Corp.*, 113 Fed.Appx. 849, 854 (10th Cir.2004) ("[A]s many cases have recognized in various contexts, excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA."). Indeed, Plaintiff wrote in her letter to the DPC that, when she submitted her application for tenure, she "felt no need to ask for any accommodations," Feb. 8, 2017 Schoper Letter 193; she sought accommodations only upon learning her evaluators would not recommend her. That Plaintiff herself neither asked for accommodations nor believed they were necessary undermines her suggestion that WIU was

18

negligent in failing to take affirmative steps by suggesting accommodations. *See* Resp. Mot. Summ. J. 13–14 & 14 n.1

Regardless of the merits of this argument, the Court agrees that summary judgment for Defendant is appropriate because Plaintiff has not shown how her proposed accommodations are reasonable accommodations as a matter of law. A reasonable accommodation "is one that allows the disabled employee to 'perform the essential functions of the employment position,'" *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) (quoting 42 U.S.C. § 12111(8)), but it is not clear what essential function of her position Plaintiff supposedly could not perform or how her proposed accommodations would facilitate them, *cf.* Resp. Mot. Summ. J. 12. *See Butler v. Collins*, Case No. 3:18-CV-00037-E, 2023 WL 318472, at *18 (N.D. Tex. Jan. 19, 2023) (granting summary judgment on the plaintiff's failure to accommodate claim because achieving tenure was not an essential function of her job as a non-tenured professor). Moreover, under the status quo, Plaintiff's evaluators already had the discretion to recommend her for tenure under the CBA and Department Criteria; however, the majority chose not to do so. As Plaintiff did not require a reasonable accommodation to be recommended for tenure, she cannot demonstrate that the absence of an accommodation was the causal reason for her denial of tenure.

## CONCLUSION

Accordingly, Defendant Board of Trustees of Western Illinois University's ("WIU") motion for summary judgment, ECF No. 18, is GRANTED. The Clerk is directed to enter judgment and close the case.

Entered this 24th day of August, 2023.

s/ Sara Darrow
SARA DARROW

_____
CHIEF UNITED STATES DISTRICT JUDGE